**RECORD NO. 21-3094**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

*In The*

# United States Court of Appeals
### For The District of Columbia Circuit

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

**v.**

## LAMONT JOHNSON, Also Known as Black,

*Defendant - Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————

### BRIEF OF APPELLANT

———————

**Stephen C. Leckar**
*(Appointed Under the Criminal Justice Act)*
**KALBIAN HAGERTY LLP**
**888 17th Street, NW, Suite 1200**
**Washington, DC 20006**
**(202) 223-5600**

*Counsel for Appellant*

## Certificate to Parties, Rulings Under Review and Related Parties

Appellant certifies as follows:

(A)  <u>Parties and Amici</u>.  The individuals who appeared before the District Court in the criminal proceedings were Lamont Johnson, Antoine J. Prailow, Jamar Gage, Antonio N Tabron, Eric Scott, Jahi Marshall, Brionta Turner and Anthony Gamble.

The following parties are before the Court: Lamont Johnson and the United States of America.

(B)  <u>Rulings Under Review:</u>

The Court is asked to review the District Court's unreported sentencing decision.

(C)  <u>Related Cases</u>:  To our knowledge, there were no related cases before the District Court and are none before this Court.

(D)  <u>Related Parties</u>:  To our knowledge, there are no related Parties before the Court.

<u>/s/ Stephen C. Leckar</u>
Stephen C. Leckar

# Table of Contents

**Page**

Certificate to Parties, Rulings Under Review and Related Parties............................i

Table of Contents ................................................................................................. ii

Table of Authorities .............................................................................................v

Jurisdictional Statement ....................................................................................1

Statement of the Issues.......................................................................................2

Constitutional Provisions, Statutes and Regulations .................................3

Concise Statement of the Case and Facts ...................................................3

Summary of Arguments.....................................................................................4

Argument.................................................................................................................7

    I.     Mr. Johnson's Base Offense Level is unsustainable.............................7

         A.    The Government's depiction of the Marshall DTO was inflated..........................................................................................8

         B.    Mr. Johnson came to the agents' attention in July of 2017 ......10

         C.    Mr. Johnson's access to PCP was limited before October 2017.........................................................................................12

         D.    Sentencing....................................................................................14

         E.    Appellate review of federal sentencings....................................18

              1.    Standards of review ........................................................18

              2.    There is a corresponding right to be sentenced based on reliable facts....................................................20

3.    Relevant conduct ............................................................21

F.    Appellate decisions remanding unfounded drug quantity
assumptions ................................................................22

G.    Mr. Johnson's Base Offense Level was mistaken ...................28

H.    Not harmless error .......................................................30

II.    The role enhancement also should be remanded ................................31

A.    Background ...............................................................32

B.    What the record showed .................................................35

C.    Discussion ...............................................................36

1.    Standard of review ........................................................38

2.    Inter-circuit analysis .....................................................38

III.    Imposing an enhancement for making a credible threat of
violence was error.  The context of Mr. Johnson's statements
shows they were borne of frustration, not intimidation ....................47

A.    Standard of review ......................................................48

B.    Mr. Johnson never threatened to harm anyone ........................48

1.    The sentencing proceedings .............................................49

2.    Mr. Johnson's speech and the contemporaneous
evidence undermines any threat theory .........................51

C.    Discussion ...............................................................53

1.    The credible threat adjustment typically requires
corroboration ................................................................54

        2.     The circumstances surrounding Mr. Johnson's remarks were equivocal and the evidence which the Trial Judge invoked was an unreliable marker of intent ........................................................................57

Conclusion ....................................................................................61

Certificate of Compliance

Certificate of Filing and Service

Addendum:

    U.S. CONST. amend. V ..........................................................Add. 1

    Sentencing Guidelines ..........................................................Add. 1

    U.S.S.G. § 2D1.1 ..................................................................Add. 1

    U.S.S.G. § 3B1.1 ..................................................................Add. 3

    U.S.S.G. § 2D1.1(b)(2).........................................................Add. 3

**Table of Authorities**

**Page(s)**

**Cases**

*Drew v. United States*,
331 F.2d 85 (D.C. Cir. 1964)........................................................58

*Elonis v. United States*,
135 S. Ct. 2001, 575 U.S. 723 (2015) ..........................................54

*Gall v. United States*,
552 U.S. 38 (2007)........................................................................18

*Martin v. United States*,
127 F.2d 865 (D.C. Cir. 1942)......................................................58

*United States v. Al-Rikabi*,
606 F.3d 11 (1st Cir 2010)............................................................41

*United States v. Anderson*,
189 F.3d 1201 (10th Cir. 1999).....................................................42

*United States v. Aragon*,
922 F.3d 1102 (10th Cir. 2019)..............................................27, 30

*United States v. Ayers*,
795 F.3d 168 (D.C. Cir. 2015)......................................................30

*United States v. Bagcho*,
923 F.3d 1131 (D.C. Cir. 2019)....................................................19

*United States v. Baro*,
15 F.3d 563 (6th Cir. 1994) ......................................................25, 30

*United States v. Barrera*,
697 Fed. App'x 373 (5th Cir. 2017)..............................................56

*Authorities upon which we chiefly rely are marked with asterisks.

v

*United States v. Bell,*
  667 F.3d 431 (4th Cir. 2011) ......................................................23, 24, 30, 40

*United States v. Belletiere,*
  971 F.2d 961 (3d Cir. 1992) ........................................................................41

United States v. Beltran-Leyva,
  916 F.3d 14 (D.C. Cir. 2016)........................................................................28

United States v. Bennett,
  554 Fed. App'x 817 (11th Cir. 2014) ..........................................................19

United States v. Bettencourt,
  614 F.2d 214 (9th Cir.1980) .........................................................................58

United States v. Bradley,
  628 F.3d 394 (7th Cir. 2010) ........................................................................20

United States v. Brown,
  892 F.3d 385 (D.C. Cir. 2018)......................................................................29

United States v. Burnett,
  827 F.3d 1108 (D.C. Cir. 2016).....................................................................21

*United States v. Burnley,*
  988 F.3d 184 (4th Cir. 2021) ................................................................37, 46

United States v. Butler,
  41 F.3d 1435 (11th Cir. 1995) ......................................................................28

United States v. Bras,
  483 F.3d 103 (D.C.Cir.2007)........................................................................60

United States v. Cameron,
  573 F.3d 179 (4th Cir. 2009) ........................................................................37

United States v. Cantu,
  765 Fed. App'x 111 (5th Cir. 2019) .............................................................56

*United States v. Carter*,
    449 F.3d 1287 (D.C. Cir. 2006) ....................................................29

*United States v. Castellone*,
    985 F.2d 21 (1st Cir 1993) ..............................................40, 41, 44

*United States v. Chase*,
    499 F.3d 1061 (9th Cir. 2007) .....................................................26

*United States v. Childress*,
    58 F.3d 693 (D.C. Cir. 1995) .......................................................21

*United States v. Claybrooks*,
    729 F.3d 699 (7th Cir. 2013) .......................................................23

*United States v. Colon*,
    919 F.3d 510 (7th Cir. 2019) .......................................................44

*United States v. Colón-Maldonado*,
    953 F.3d 1 (1st Cir. 2020) ............................................................20

*United States v. Culps*,
    300 F.3d 1069 (9th Cir. 2002) .....................................................26

*United States v. Elwood*,
    999 F.2d 814 (5th Cir. 1993) .......................................................20

*United States v. Fernandez*,
    636 Fed. App'x 71 (2d Cir. 2016) ...............................................56

*United States v. Flores*,
    725 F.3d 1028 (9th Cir. 2013) .....................................................19

*United States v. Flores*,
    995 F.3d 214 (D.C. Cir. 2021) .....................................................18

*United States v. Forrester*,
    616 F.3d 929 (9th Cir. 2010) .......................................................26

*United States v. Freeman,*
    763 F.3d 322 (3d Cir. 2014) .............................................................20, 23, 28

*United States v. Garcia,*
    19 F.3d 1123 (6th Cir. 1994) .......................................................................43

*United States v. Garrett,*
    757 F.3d 560 (7th Cir. 2014) .......................................................................23

*United States v. Gibbs,*
    182 F.3d 408 (6th Cir. 1999) .......................................................................25

*United States v. Gibson,*
    985 F.2d 860 (6th Cir. 1993) .......................................................................42

*United States v. Giggey,*
    867 F.3d 236 (1st Cir. 2017).......................................................................19

*\*United States v. Graham,*
    162 F.3d 1180 (D.C. Cir. 1998)......................................................32, 37, 45

*United States v. Hardin,*
    437 F.3d 463 (5th Cir. 2006) .......................................................................19

*United States v. Harrison,*
    743 F.3d 760 (10th Cir. 2014) .......................................................20, 27, 30

*United States v. Helding,*
    948 F.3d 864 (7th Cir. 2020) .......................................................................20

*United States v. Holden,*
    908 F.3d 395 (9th Cir 2018) .................................................................44, 46

*\*United States v. Ienacco,*
    893 F.2d 394 (D.C. Cir. 1990)......................................................................29

*United States v. Jaimes-Molina,*
    2015 WL 4254459 (N.D. Ind., Sept. 9, 2019)..............................................54

*United States v. Jordan*,
    291 F.3d 1091 (9th Cir. 2002) .......................................................45

*\*United States v. Kilby*,
    443 F.3d 1135 (9th Cir. 2006) .......................................................26

*United States v. Kirk Tang Yuk*,
    885 F.3d 57 (2d Cir. 2019) ....................................................48, 55

*United States v. Kpodi*,
    824 F.3d 122 (D.C. Cir. 2016).......................................................30

*United States v. Lewis-Zubkin*,
    907 F.3d 1103 (8th Cir. 2018) .......................................................55

*United States v. Logan*,
    121 F.3d 1172 (8th Cir. 1997) .......................................................44

*United States v. Lopez*,
    219 F.3d 343 (4th Cir. 2000) .......................................................24

*United States v. Lujan*,
    25 F.4th 324 (5th Cir. 2022) ............................................20, 24, 30

*United States v. Maloof*,
    205 F.3d 819 (5th Cir. 2000) .......................................................45

*\*United States v. Mankiewicz*,
    122 F.3d 399 (7th Cir. 1997) .......................................................46

*United States v. Marquez*,
    699 F.3d 556 (1st Cir. 2012)....................................................23, 30

*United States v. McCants*,
    434 F.3d 557 (D.C. Cir. 2006).......................................................20

*United States v. McIlwain*,
    931 F.3d 1176 (D.C. Cir. 2019)....................................................30

*United States v. Medina*,
    167 F.3d 77 (1st Cir. 1999)............................................................................32

*United States v. Miele*,
    989 F.2d 659 (3d Cir. 1993) .........................................................................59

*United States v. (Frederick) Miller*,
    890 F.3d 317 (D.C. Cir. 2018) ("*Miller I*"),
    *appeal after remand*, 35 F.4th 807 (D.C. Cir. 2022) ("*Miller II*")....18, 19, 21

*United States v. Milledge*,
    109 F.3d 312 (6th Cir. 1997) .........................................................................25

*United States v. Moore*,
    666 F.3d 313 (4th Cir. 2012) .........................................................................22

*United States v. Mustread*,
    42 F.3d 1097 (7th Cir. 1994) .........................................................................39

*United States v. Olejiya*,
    754 F.3d 986 (D.C. Cir. 2014).......................................................................37

*United States v. Perez*,
    962 F.3d 420 (9th Cir. 2020) .........................................................................55

*United States v. Pineda-Duarte*,
    933 F.3d 519 (6th Cir. 2019) ...................................................................48, 54

*United States v. Price*,
    409 F.3d 436 (D.C. Cir. 2005)..................................................................55, 60

*United States v. Quigley*,
    373 F.3d 133 (D.C. Cir. 2004).......................................................................38

*United States v. Redifer*,
    631 Fed. Appx. 548 (10th Cir. 2015) ............................................................56

*United States v. Resterhouse*,
    685 Fed. App'x. 436 (6th Cir. 2017) .......................................................56, 57

*United States v. Robinson*,
    164 F.3d 1068 (7th Cir. 1999) ........................................................9

*United States v. Rodriguez-Lopez*,
    756 F.3d 422 (5th Cir. 2014) ......................................................43

*United States v. Ronning*,
    47 F.3d 710 (5th Cir. 1995) ........................................................44

*United States v. Rowe*,
    919 F.3d 752 (3d Cir. 2019) ......................................................20

*United States v. Ruiz*,
    446 F.3d 762 (8th Cir. 2006) ......................................................19

*United States v. Russell*,
    156 F.3d 687 (6th Cir. 1998) ......................................................25

*United States v. San Martin*,
    505 F.2d 918 (5th Cir. 1974) ................................................58, 59

*United States v. Sarchett*,
    3 F.4th 1115 (8th Cir. 2021) ......................................................25

*United States v. Sayles*,
    296 F.3d 219 (4th Cir.2002) ......................................................39

*United States v. Sepulveda*,
    15 F.3d 1161, 1197 (1st Cir.1993) ..............................................23

*United States v. Settles*,
    530 F.3d 920 (D.C. Cir. 2008)....................................................18

*United States v. Shacklett*,
    921 F.2d 580 (5th Cir. 1991) ......................................................20

*United States v. Sheffield*,
    832 F.3d 296 (D.C. Cir. 2016)....................................................59

*United States v. Shonubi*,
   998 F.2d 84 (2d Cir. 1993), *appeal after remand*,
   103 F.3d 1085 (2d Cir. 1997) ...........................................................23

*\*United States v. Slade*,
   631 F.3d 185 (4th Cir. 2011) .........................................................38, 39, 46

*United States v. Smith*,
   705 F.3d 1268 (10th Cir. 2013) ....................................................19

*\*United States v.  Stover*,
   329 F.3d 859 (D.C. Cir. 2003).....................................................21, 22, 23, 30

*United States v. Sykes*,
   854 F.3d 457 (8th Cir. 2017) ..............................................................48, 55

*United States v. Thomas*,
   33 Fed. App'x. 782 (11th Cir. 2020) .........................................................56

*United States v. Thompson*,
   944 F.2d 1331 (7th Cir. 1991) ........................................................44

*United States v. Tucker*,
   404 U.S. 443 (1972)........................................................................20

*United States v. Vargas*,
   16 F.3d 155 (7th Cir. 1994) ................................................................40, 44

*United States v. Vega*,
   826 F.3d 514 (D.C. Cir. 2016).......................................................38

*United States v. Walker*,
   578 Fed. App'x 812 (11th Cir. 2014) ..........................................................56

*\*United States v. Weaver*,
   716 F.3d 439 (7th Cir 2013) ..........................................................37, 39, 40

*United States v. White*,
   621 Fed. App'x 889 (9th Cir. 2015) ...........................................................56

*United States v. Woodside*,
   642 F. App'x 490 (6th Cir. 2016)................................................25

*United States v. Wright*,
   42 F.3d 1387 (4th Cir. 1994) ...................................................19

*United States v. Wyche*,
   741 F.3d 1284 (D.C. Cir. 2014)................................................21

**Statutes**

18 U.S.C. § 922(g)(1)................................................................1

18 U.S.C. § 924(c)(1)................................................................1

18 U.S.C. § 3553(a) ...............................................................18

21 U.S.C. § 841(a)(1)................................................................1

21 U.S.C. § 841(b)(1)(A)(iv) ........................................................1

21 U.S.C. § 846 ......................................................................1

28 U.S.C. § 1291 ...................................................................2

**Rule**

Fed. R. Evid. 1101(d)(3) ...........................................................59

**Guidelines**

U.S.S.G. § 2D1.1...................................................................5

U.S.S.G. § 2D1.1(b)(2) .................................................6, 47, 48, 53, 54

U.S.S.G. § 3B1.1.................................................5, 31, 38, 39, 40

U.S.S.G. § 3B1.1(b) ...............................................................36

U.S.S.G. § 3B1.1(b). cmt. n. 4 .....................................................37

**Other Authorities**

2 J. WIGMORE, EVIDENCE § 304 (Chadbourn rev. 1979) .................................58

2021 Sentencing Table (available at https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-5) (last accessed August 6, 2022)......30

BLACK'S LAW DICTIONARY ONLINE (2d ed.) (available at file:///C:/Users/sleckar/AppData/Local/Microsoft/Windows/INetCache/Content.Outlook/1K4HRKGJ/What%20is%20THREAT_%20definition%20of%20THREAT%20(Black's%20Law%20Dictionary).pdf) (last accessed May 24, 2022) .................................................................................................54

D.C. Department of Health, DISTRICT OF COLUMBIA COMMUNITY HEALTH NEEDS ASSESSMENT p. ix (Feb. 28, 2014) (available at https://dchealth.dc.gov/sites/default/files/dc/sites/doh/page_content/attachments/DC%20DOH%20CHNA%20%28v5%200%29%2005%2007%202014%20-%20FINAL%20%282%29.pdf) (last visited July 1, 2022).................................1

*Jacob Schuman, *Probability and Punishment: How to Improve Sentencing by Taking Account of Probability*, 18 NEW CRIM. L. REV. 214 (2015).....................22

Robert J. Sampson & L. Ash Smith, *Rethinking Criminal Propensity and Character: Cohort Inequalities and the Power of Social Change*, 50 CRIME AND JUSTICE: A REVIEW OF RESEARCH 13 (2021) .....................................................60

Oral Argument- Not Yet Scheduled

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 21-3094

**UNITED STATES OF AMERICA,**
**Appellee,**

**v.**

**LAMONT JOHNSON,**
**Appellant.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

APPELLANT'S MAIN BRIEF

**Jurisdictional Statement**

A jury found Appellant guilty of conspiracy to distribute and possess with

the intent to distribute PCP and the substantive offense (21 U.S.C. §§ 841(a)(1);

841(b)(1)(A)(iv), 846); possessing as a convicted felon a firearm and ammunition

(18 U.S.C. § 922(g)(1)); and possessing a firearm in furtherance of a drug

trafficking offense (18 U.S.C. § 924(c)(1)).  He was sentenced to 420 months

imprisonment—a life sentence for a 45-year-old non-Hispanic Black male[1]—and

---

[1]    D.C. Department of Health, DISTRICT OF COLUMBIA COMMUNITY HEALTH NEEDS
ASSESSMENT p. ix (Feb. 28, 2014) (available at
https://dchealth.dc.gov/sites/default/files/dc/sites/doh/page_content/attachments/D
C%20DOH%20CHNA%20%28v5%200%29%2005%2007%202014%20-
%20FINAL%20%282%29.pdf)(last visited July 1, 2022).

1

sixty-months supervised release.  A Notice of Appeal was timely filed.[2]

Jurisdiction is invoked under 28 U.S.C. § 1291.

**Statement of the Issues**

Those errors we identify are:

**1. [Base Offense Level].**  The Government never proved that Mr. Johnson was involved with at least three kilograms of PCP.  Was his Sentencing Guidelines Base Offense Level 32 overstated?

**2. [Aggravated Role Adjustment].**  Mr. Johnson was an independent operator who was neither affiliated with nor a member of any criminal enterprise. Was his three-level Manager-Supervisor Role Adjustment to the Base Offense Level justifiable?

**3. [Credible Threat of Violence Adjustment].**  Mr. Johnson's comments about injuring others were offhanded expressions of frustration couched in the argot of someone with a tenth-grade education.  Those to whom he addressed his remarks never treated them seriously.  Was his two-level upwards sentencing adjustment error?

---

[2]   (App:870).

## Constitutional Provisions, Statutes and Regulations

Applicable Constitutional provisions, statutes, and Sentencing Guidelines

appear in the Addendum.

## Concise Statement of the Case and Facts[3]

The government indicted Mr. Johnson and others for engaging in a narcotics

distribution conspiracy operating around Good Hope Rd, SW.  It contended that

between 2014-2017 Jahi Marshall ("Marshall") headed an eponymous Drug

Trafficking Organization, marketing retail-sized and larger drug quantities.  No

"insiders" testified.  Agents presented wiretaps, photographs, and films proving

overwhelming evidence of Marshall's scheme.  The problem?  Marshall and his

accomplices were not on trial.  Lamont Johnson was.  And the evidence against

him was that he was an independent merchant.

In July 2017, several months after being permitted to wiretap, the

Government first learned of Mr. Johnson.  Agents overheard conversations

between him and Jamar Gage ("Gage"), whom they knew was supplying Marshall.

The investigators believed Mr. Johnson had just made one and possibly two PCP

sales to Gage and thought he had an association with the Marshall operation.

---

[3]   This section serves as an overview.  Pertinent facts appear in each legal
argument.  Citations to wiretapped communications are from transcripts used at
trial.  (App:602-633).

Continued bugging revealed Mr. Johnson complaining constantly about lacking any supply and that he and Antoine Prailow ("Prailow") were seeking a gallon of PCP from "Slim," a West Coast dealer. Once it arrived in mid-October Mr. Johnson was arrested. A search of his car pursuant to a warrant yielded 1.4KG of PCP (12% pure), bottles, an AR-15 rifle in a bag, and ammunition.

Mr. Johnson's sentencing was unreliable. The finding that he'd arranged to deal between 3-10 Kilograms of PCP, the ambit of Guidelines Level 32, is unfounded and excessive. The Role Adjustment is flawed because he wasn't in Marshall's group and controlled nobody. And the adjustment for making credible threats of violence in narcotics dealings is meritless. His listeners plainly didn't consider his statements to be genuine and he took no steps suggesting otherwise.

## Summary of Arguments

**1.** Mr. Johnson's Base Offense Level of 32 was artificially inflated. Following a three-year investigation, in March 2017 the Government was permitted to wiretap Marshall. Next it obtained permission to wiretap Gage, after he was overheard communicating with Marshall. In late July the agents intercepted Gage seemingly arranging to purchase PCP from someone whom they later determined was Mr. Johnson. Although their coded communications were abstruse, Gage seemingly bought 16 oz.—if that much—from Mr. Johnson.

4

In August wiretapping on Mr. Johnson's telephone was authorized. The interceptions disclosed that his contraband stock was almost nonexistent, and he fretted near-incessantly of being unable to meet his car note, rent, and expenses.

Around September the agents deduced that he and Prailow had arranged to import PCP from the West Coast. When it arrived in mid-October, Appellant was arrested, and the PCP shipment and his weapon were seized.

There was no basis to hold Mr. Johnson responsible for trafficking between three-ten KG of PCP. He was an autonomous actor who'd recently returned to the trade and his transactions were scattered. Including the July sale to Gage and the October shipment from Slim, his U.S.S.G. § 2D1.1 Base Offense Level should have been a 30, covering PCP dealings between one-three KG.

**2.** Adding a three-level manager-supervisor adjustment under U.S.S.G. § 3B1.1 was correspondingly misplaced. This alteration requires being in a hierarchy. However, the Trial Judge never identified Mr. Johnson's "Leader." And nothing shows him as belonging to any criminal enterprise, let alone controlling at least one of five or more "participants"—associates with *mens rea*. He never interacted with Marshall and never told anyone where to sell drugs, what quantities they could sell or what prices to charge. His short-lived venture with Prailow likewise lacked any characteristics of management or supervision.

5

The Government made much ado of a telephone call between Mr. Johnson and his estranged wife, which occurred as he was leaving their apartment to live with his girlfriend and their baby. It successfully (albeit incorrectly) argued that telling her to bring his rifle and some bottles down to their car manifested control. But again, he was an independent actor and there weren't the five-or-more participants necessary to trigger this "bump." Although his wife's help perhaps facilitated his conduct it didn't manifest his *control* over her.

**3.** The Trial Court likewise erroneously imposed a two-level upwards adjustment under U.S.S.G. § 2D1.1(b)(2) for making three credible threats of violence.

Those instances unmistakably reflected an uneducated man's speech and were borne of frustration. No participant reacted as if Mr. Johnson really was seeking to injure anyone. Indeed, when he and his wife were revisiting the last of these events, she laughed about it. The District Court overlooked those countervailing considerations and focused on Appellant's conviction for Assault with a Deadly Weapon ("ADW"), which arose from a 2001 confrontation with a romantic rival. The District Judge's using that conviction to conclude that statements made in 2017 were threats was a fig leaf for unreliable propensity evidence.

6

## Argument

### I.    Mr. Johnson's Base Offense Level is unsustainable.

The Government's exaggerated conspiracy theory against Mr. Johnson led to his being over-sentenced.  Its wiretap applications depicted the so-called Marshall Drug Trafficking Organization ("DTO") as a significant enterprise, reselling drugs to many mid-level local suppliers while maintaining a retail presence.  The prosecution asserted that Mr. Johnson was a significant PCP supplier to the Marshal group.

Scrutinizing the wiretap applications, the prosecution case's structure, the trial record, and the Probation Office's conclusory findings yields a far more nuanced reality.  Mr. Johnson was an independent trader who made a small-sized deal late in July 2017 with one of Marshall's suppliers and then shared in buying 1.4KG of "Slim's" PCP that October.  However, the District Judge mistakenly sentenced Mr. Johnson for trafficking in a far greater quantity of PCP.

We first contrast how the Government's wiretap applications described the Marshall coterie and how the trial revealed it as largely a neighborhood crew retailing drugs.  We then explain that Mr. Johnson was not supplying them, although the record discloses those who were by 2017, when the investigation gained momentum.  Next, we turn to late July 2017, after Mr. Johnson had returned from "retirement" (his words) to drug dealing, seeking income while

7

starting a trucking business. The agents overheard Gage, Marshall's boon companion and supplier, speaking with Mr. Johnson. They thought that Mr. Johnson had made two (if that) PCP sales of unknown purity to Gage, totaling 24 oz. or so. Their coded talk, never interpreted by a cooperator, is incapable of a responsible reconciliation, much less one supporting that number.

Once the agents secured permission to wiretap Mr. Johnson's cellphone, they quickly learned that he lacked PCP, was constantly grousing about financial stress, and was seeking replenishment from the West Coast, where much PCP originates. When it arrived, he was accosted with 1.4 KG of a mixture that was 12% pure. This prosecution, which included several Marshall group members (who pleaded guilty), followed.

The judge's quantity calculation was must-have-been speculation which erroneously consigned Mr. Johnson to Base Offense Level 32.

A.    The Government's depiction of the Marshall DTO was inflated.

The Government's diminishing description of the Marshall DTO is a useful kick-off point. Beginning in March 2017, after nearly a three-year investigation, it was permitted to wiretap Marshall. It represented that he oversaw a sixty-person group dubbed the "Choppa City Crew" and "Cruddy Bang Family." Gage's crew

allegedly offered a retail smorgasbord around Good Hope Rd, while wholesaling regionally to "many" unnamed "mid-level drug dealers."[4]

The wiretap applications identified two of Marshall's suppliers: Eric Scott, who was apprehended in May 2017, and Gage.[5]  Gage also supplied Antonio Tabron ("Tabron"), whom they'd overheard on intercepts and considered a "redistributor."[6]

Marshall's operation seems more of a corner crew.  Over 2.5 of the five trial days, the prosecution focused on Marshall and several cohorts' retail sales.[7]  An inter-agency investigation began in June 2014 and utilized pole cameras, visual surveillance, "controlled buys," and traffic stops.  Abundant proof appears of the group's selling 1 and 2-oz bottles of PCP, PCP-laced cigarette "dippers," crack,

---

[4]   (App:72, 77, 84-86); (App:112, 115-116, 125-127); (App:154, 157-158, 167-169).

[5]   (App:86-87, 96-97); (App:127).  *See also* (App:349, 577-578).

[6]   (App:127, 252).  Although the Government claimed Tabron also supplied Marshall, those dealings presumably didn't involve Gage, who wouldn't have needed a middleman.  "While … people involved with [drugs] might not be very bright, we don't believe we can assume they are necessarily stupid, especially in matters of finance." *United States v. Robinson*, 164 F.3d 1068, 1070-1071 (7th Cir. 1999).

[7]   (App:206-222, 225-249, 250-251, 254-257, 258-293, 296-323, 352-403, 412-434).

heroin, and Fentanyl around Good Hope Rd.  There is scant evidence of it supplying "mid-level" dealers.[8]

In any event, tagging Mr. Johnson with Marshall's taint was inexplicable. He was never seen around Good Hope Road.  A pen register and real-time surveillance of Marshall's phone and interactions with Gage yielded no trace of Mr. Johnson.[9]  And nobody observed or overheard him with Tabron.[10]

At the Rule 29 conference, the District Court questioned the conspiracy case's premises and found that they justified a buyer-seller jury instruction.[11]

B.    <u>Mr. Johnson came to the agents' attention in July of 2017.</u>

About seven months into the wiretapping,[12] some July 26th intercepts on Gage's phone piqued the agents' interest.  They gathered that Tabron and his brother had just bought 8 ounces of PCP elsewhere but were considering a 16-oz. deal with Gage. They thought Gage possibly had sold Tabron as much the day

---

[8]    (App:238-246, 264-293, 296-323, 436-440, 581).  The "buys" occurred in April and July-September.  (App:369-372, 378-379, 393-402, 415-416, 436-436).

[9]    (App:223-231, 236-237, 333-349, 490, 581-582).  *See also* (App:134-135); App:178-181, 191-192).  GPS monitoring never placed Mr. Johnson near Gage. (App:346-347).

[10]    (App:223-231, 236-237, 333-349, 490).  *See also* (App:134-135); App:170-181).

[11]    (App:599-601).

[12]    (App:236-237).

before, although the veiled wiretap intercepts don't confirm it.  Gage intimated having a possible source for a deal.  He telephoned a theretofore unknown number (described in a wiretap application as "TT3") and spoke with someone whom the agents ultimately concluded was Mr. Johnson.   The investigators believed they discussed an 8-oz. purchase—but here again, the participants' talk is murky, and nobody witnessed any delivery.[13]

Thinking themselves homing in on Gage and Marshall's supplier—a mistake—the agents secured new wiretap authorizations.  Surveillance and bugging revealed that Mr. Johnson and his wife rented a spartan one-bedroom apartment on Hayes St., NE, and that he was a commercial truck driver seeking employment (which he secured in September) with but $700 in the bank that month.[14]

Eavesdropping on Mr. Johnson never yielded mention of Marshall or his crew.[15]

_____

[13]    (App:127-133; 324-330).  The prior day, a "buy" secured two ½-oz bottles of PCP from Tabron, whose source was uncertain.  The agents realized that Tabron had other suppliers.  (App:131-132, 133-134).

[14]    (App:170, 332, 441, 453, 472-484, 489-499, 571).  Photographs of the apartment's search confirm its modest nature. (App:773-777).

[15]    (App:128, 130; 170-178; 639-641, 652-655, 660-772).

C.    <u>Mr. Johnson's access to PCP was limited before October 2017</u>.

The wiretaps did establish to a fare-thee-well that Mr. Johnson worried all summer over covering quotidian expenses and forestalling eviction.[16]

Those exigencies are traceable.  He'd worked for the D.C. Government as a truck driver between May 2014-March 2017, when he founded a trucking company.  As he confided in late August to Mr. Prailow, he'd been "retired" and "chilling" until Slim had reached out; "[m]y only thing for jumping back in this shit is to grab my truck."[17]

Aside from the July 26th-27th oblique interaction with Gage—suggesting a 16-oz sale (and intimating but never confirming a subsequent 8-oz. transaction) of PCP[18]—Mr. Johnson's cupboard was thin to nonexistent.[19]  Data extraction from his cellphone disclosed he'd gone so far as to examine how to create PCP.[20]

---

[16]    (App:170-172, 173; 445, 448-449, 452 & 663-670); (App:440-447 & 673-674, 687-689); (App:448-454 & 727-730).

[17]    (App.663-670); *see also* (App:570-571; 881, 924-925).

[18]    PCP, once here, is adulterated to increase retail sales.  (App:592-595)

[19]    (App:170-174, 177-178; 673-674, 687-689, 722-723).

[20]    (App:357-365, 560-569).

Later that summer Mr. Johnson appeared on a pen register and was overheard speaking with Prailow,[21] whom the Government characterized as a co-investor in the deal with Slim.[22]  Prailow had no connection to Gage.[23]

Once Slim's shipment arrived, the agents secured search and arrest warrants. In Mr. Johnson's apartment were funnels, vials, and a bottle of gasoline treatment. They seized from his car 1.4 KG of PCP (at 12% pure, 160 grams,), a weapon, and PCP-associated paraphernalia.[24]  They recovered no cash or jewelry; his car was repossessed, and his lender wrote off the $8500.00 note.[25]

Two days later, Prailow fled from officers patrolling a "hot spot" neighborhood.  He was apprehended with a weapon, $692.00 and a 62-gram mixture that was 4% pure PCP—2.67 grams.  The government didn't empirically associate that with what was seized from Mr. Johnson.[26]

---

[21]   (App:170-172, 178-181; 663-670, 685-686, 687-689, 724-726).

[22]   (App:522-523).

[23]   (App:572, 576, 580).

[24]   (App:403-409, 464-475, 483-488, 500, 509-519, 524-527).

[25]   (App:925, 926).

[26]   (App:528-546, 547-557, 584, 596-598)

Marshall's crew remained operating for another four-five months.[27]

D.    Sentencing

Mr. Johnson's Base Offense Level was set at a 32, by finding him responsible for at least 3 kilograms of PCP.[28]  This conclusion resulted from unsupported statements and misconceptions, beginning with the PSR:

1.    The PSR stated that "[o]n one occasion in July 2017, Jamar Gage and Antonio Tabron together acquired 32 ounces of PCP from Lamont Johnson.  On another occasion, on July 26, 2017, Mr. Tabron negotiated with Jamar Gage to acquire another 16 ounces of PCP from Lamont Johnson.  He informed Mr. Gage he could acquire 16 ounces of PCP from another supplier for $2,400 or $2,600 and he could buy eight ounces from Lamont Johnson.  He also said if defendant Johnson had the same quality PCP as the previous occasion, he would acquire 16 ounces from him."[29]  However, the "one [prior] occasion in July" is an enigma—the PSR lacks support for any sale, leaving aside 32 ounces, by Mr. Johnson before July 26th.

2.    "On July 28, 2017, after not hearing from Mr. Gage in a timely manner, Antonio Tabron informed Mr. Gage he was prepared to purchase 16 ounces of PCP from defendant Johnson but that he had bought eight ounces from his other supplier.  On that occasion, he ordered eight ounces of PCP from Mr. Gage for $1,300 USD.  One minute after this conversation, Jamar Gage called Lamont Johnson to make the purchase arrangements, then contacted Antonio Tabron to arrange the logistics."[30]  This

---

[27]    (App:882-883).

[28]    (App:881, 890, 892); App:808, 809, 811).

[29]    (App:890).

[30]    (App:890).

<u>8-oz. sale by Mr. Johnson is unsubstantiated by the wiretaps'
roundabout speech (or by surveillance);[31] nothing shows such
an agreement as struck or consummated.</u>

3.   "On September 8, 2017[,] at 5:48 pm, law enforcement
     intercepted Jamar Gage via a wiretap on Lamont Johnson's
     phone in which . . . Johnson advised Mr. Gage he was "hurting
     like shit" because his money was tied up in the gallon of PCP
     he was waiting to receive from the west coast."[32]

4.   Inside Mr. Johnson's car trunk was "was approximately one
     kilogram of PCP…. A DEA chemist determined that the
     substance was PCP weighing 1,429 grams and a sample of the
     suspected PCP had a purity level of 12% (resulting in 100
     grams or more of actual PCP)."[33]

Somehow the Probation Office conjured 40 oz. (evidently assuming 32 oz.

plus 8 oz.) of sales of unknown purity made in July, and added the seized 1.4 KG

of 12% pure, to surmise somehow that "Johnson conspired to distribute and

possess with the intent to distribute at least three kilograms, and potentially up to

ten kilograms, of a mixture and substance of PCP; and at least 300 grams of actual

PCP."[34]  This unrealistic conclusion is mathematically unsupported.

Mr. Johnson contended that his PCP dealings were about 2 KG of detectable

PCP and less than 300 grams of actual PCP and that his Base Offense Level should

---

[31]   (App:649-655).

[32]   (App:890).

[33]   (App:892).

[34]   (App:892).

be at 30 or less.[35]  After argument,[36] the District Judge chose Level 32—after

mistakenly dwelling over sentencing ranges that require jury findings—and then

strayed from the record:

> THE COURT:  And I think [AUSA] Mr. Eliopoulos is discussing that
> based on his argument that they had to have the mandatory
> requirement in there to get to the mandatory minimum sentence
> required in the jury form, and the jury form found -- you must answer
> the following questions:  The amount of PCP the defendant possessed
> -- and I'm reading from the form -- one kilogram or more of a mixture
> containing a detectable amount of PCP. Proven. 100 grams or more of
> actual PCP.  And that was repeated twice. So I think under that
> authority, my original conclusion I had was that the jury had to find
> 300 grams -- no, 300 kilos -- I'm sorry, three kilos or more -- or 300
> grams or more of the PCP beyond a reasonable doubt is incorrect
> based upon reading of that case.  It had not been brought to my
> attention previously.  But it seems to me that's in line with the
> *Graham* case, which I said has the inverse but still applicable rule,
> that *Alleyne* has not been strictly followed as to giving the sentence
> that's within the statutory framework and did not exceed the statutory
> framework of these counts.  So I'm going to find that the two
> kilograms, or 200 grams, quantity can be used to indicate, based upon
> the facts before the Court, that there were 3 kilograms, or 300 grams,
> in evidence, because of the multiple discussions of gallons of PCP
> throughout the entire case.  There's no question that he discussed
> multiple times knowing the gallons and other quantities of PCP are far
> in excess of the two kilograms that the jury returned a verdict of. The
> jury simply said there was two or more without a definition.
>
> Mr. Eliopoulos. MR. ELIOPOULOS: They said one or more, Your
> Honor.
>
> THE COURT: Oh, the jury said one or more, I'm sorry.

---

[35]   (App:783, 852).

[36]   (App:828-861).

MR. ELIOPOULOS: Right.

THE COURT: He said -- I was thinking two or more. You're right. I'm just reading a different scenario as I had in my mind here. I think you can find that there were three or more kilograms based upon the evidence in the case without a question of the discussions of Mr. Johnson in his own words as to what he was doing. So I believe that the three kilograms apply in this case and the threat of violence applies and manager or supervisor applies.

***

THE COURT: All right. Thank you. We're back in court after the short break. I finished the last hearing after substantially having reviewed the Guidelines sentencing requirements and made a the ruling, results in a base offense level of -- I find there are three kilos, a 32….[37]

The jury only found one kilogram or more of a *mixture* containing a detectable amount of PCP and 100 grams or more of actual PCP.[38] No ledgers were seized, no insiders testified and no wiretapping corroborates Mr. Johnson discussing "gallons" of PCP on "multiple occasions"—or ever.[39] The bugging indicated one sale in late July of sixteen ounces of PCP of unknown purity,

---

[37]    (App:854-856, 860-861).

[38]    (App:778-780).

[39]    The Government's expert testified that PCP wholesaled at $32,000-$35,000 per gallon delivered locally. (App:587-595). No evidence shows Mr. Johnson having funding for multiple gallons.

followed by two months without a supply, followed by the 1.4 KG mixture seized in October—well under Level 32's three-kilogram threshold.[40]

E.    Appellate review of federal sentencings

After outlining the standards of review, Mr. Johnson addresses the law's demand that sentencings correctly resolve material factual and legal disputes.  He then explains the weaknesses infecting his sentence.

1.    Standards of review

Guidelines sentences are reviewed for reasonableness[41] to "ensur[e] both that the District Court did not commit a 'significant procedural error' and that the sentence is substantively reasonable."[42]  Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." [43]

---

[40]    Even if Mr. Johnson had made a second sale in late July to Gage—which is denied—that wouldn't have approached Level 32's brink.

[41]    *United States v. Flores*, 995 F.3d 214, 219 (D.C. Cir. 2021) (cleaned up).

[42]    *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (citation omitted)). *Accord United States v. (Frederick) Miller*, 890 F.3d 317, 324 (D.C. Cir. 2018) ("*Miller I*"), *appeal after remand*, 35 F.4th 807 (D.C. Cir. 2022) ("*Miller II*").

[43]    *Gall v. United States*, 552 U.S. 38, 51 (2007); *Miller I*, 890 F.3d at 324.

Review is *de novo* for questions of law and clear error for factual findings, giving "'due deference' to the district court's application of the Guidelines to facts."[44] "A finding is 'clearly erroneous' when … the reviewing court … is left with the definite and firm conviction that a mistake has been committed."[45]

Because fact-finding results from a process, an intermediate issue has significance. "Drug quantity is an important integer in the sentencing calculus for most controlled substance offenses."[46] "[R]elatively small differences in the quantity or kind of drugs involved in an offense may dramatically alter a defendant's prison term...."[47] This potential for prejudicial error requires *de novo* review of the methodology used to set narcotics offenders' Base Offense Levels.[48]

---

[44]  *United States v. Bagcho*, 923 F.3d 1131, 1138 (D.C. Cir. 2019) (remanding) (cleaned up).

[45]  *Miller II*, 35 F.4th at 817 (cleaned up).

[46]  *United States v. Giggey*, 867 F.3d 236, 238-39 (1st Cir. 2017) (cleaned up).

[47]  *United States v. Ruiz*, 446 F.3d 762, 773 (8th Cir. 2006) (cleaned up).

[48]  *Giggey*, 867 F.3d at 240; *United States v. Bennett*, 554 Fed. App'x 817, 821n.3 (11th Cir. 2014); *United States v. Flores*, 725 F.3d 1028, 1035 (9th Cir. 2013); *United States v. Smith*, 705 F.3d 1268, 1274 (10th Cir. 2013); *United States v. Hardin*, 437 F.3d 463, 471 (5th Cir. 2006); *United States v. Wright*, 42 F.3d 1387, *3 (4th Cir. 1994) (unpublished) ("proper method of calculating drug weight is a legal question subject to *de novo* review…").

2.    <u>There is a corresponding right to be sentenced based on reliable facts</u>.

The Constitution and Sentencing Guidelines alike demand that sentences be based on reliable evidence.[49]  A PSR must be free of "'[b]ald conclusionary statements.'"[50]  Factual findings must be tethered to the record,[51] not "based only on unsubstantiated allegations."[52]  Guidelines sentences also "'must be supported by reasons,'" meaning "'something more than conclusions—a distinction important not only to the defendant whose future is at stake but also to the appellate process.'"[53]

---

[49]    *United States v. Tucker*, 404 U.S. 443, 447 (1972) (Constitution); *United States v. Colón-Maldonado*, 953 F.3d 1, 9-10 (1st Cir. 2020) (Constitution and Guidelines; remanding); *United States v. Bradley*, 628 F.3d 394, 400 (7th Cir. 2010) (Constitution; remanding for undue speculation).

[50]    *United States v. Lujan*, 25 F.4th 324, 329 n.14 (5th Cir. 2022) (remanding erroneous quantity calculation) (citing *United States v. Elwood*, 999 F.2d 814, 817-18 (5th Cir. 1993) (AUSA's unsworn assertions not "by themselves, a sufficiently reliable basis on which to sentence the defendant.")).

[51]    *United States v. Helding*, 948 F.3d 864, 870-872 (7th Cir. 2020) (government-endorsed calculation of drug quantity vague); *United States v. Rowe*, 919 F.3d 752, 762-763 (3d Cir. 2019) (PSR's drug weight conclusions unsupported); *United States v. Harrison*, 743 F.3d 760, 764-765 (10th Cir. 2014) (same).

[52]    *United States v. Freeman*, 763 F.3d 322, 337 (3d Cir. 2014) (PSR's conclusory assertions of drug weight were error); *United States v. Shacklett*, 921 F.2d 580, 584 (5th Cir. 1991) (sentencing court incorrectly endorsed probation office's "conclusory statement" regarding drug quantity).

[53]    *United States v. McCants*, 434 F.3d 557, 562 (D.C. Cir. 2006) (remanding) (cleaned up).

3.    Relevant conduct

"'Under the Sentencing Guidelines, a district court determines a defendant's sentencing range by calculating the defendant's base offense level.  A base offense level, in turn, is derived from a defendant's 'relevant conduct.'  For drug offenses, 'relevant conduct' includes the quantity of drugs involved in the offense.'"[54]

In conspiracy prosecutions "the amount of drugs attributable to any one codefendant as 'relevant conduct' . . . is limited to the reasonably foreseeable transactions in furtherance of that codefendant's 'jointly undertaken criminal activity'. . . ."[55]  Trial judges "must make particularized findings about both the scope of the agreement that the defendant entered into and the basis on which it finds the amount of drugs reasonably foreseeable to that individual defendant."[56]  "[A] jury verdict "does not address the question of which specific actions demonstrated at trial were in furtherance of that single conspiracy or were foreseeable to the conspirators.  And it is only these actions that may form the predicate for … sentences."[57]

---

[54]    *Miller I*, 890 F.3d at 329 (quoting *United States v. Burnett*, 827 F.3d 1108, 1120 (D.C. Cir. 2016) (remanding)).

[55]    *United States v. Wyche*, 741 F.3d 1284, 1292 (D.C. Cir. 2014) (cleaned up).

[56]    *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995).  *Accord United States Stover*, 329 F.3d 859, 874 (D.C. Cir. 2003).

[57]    *Childress*, 58 F.3d at 722-23.

21

F.     Appellate decisions remanding unfounded drug quantity assumptions

Sentencing cannot be based "on speculation or hypothesis."[58]  Using

assumptions and extrapolations to sentence narcotics offenders portends risk:

> When drug quantities are calculated based on a few key data
> points, they are particularly vulnerable to error.  For instance, the
> court might misjudge the street price of the drug when converting
> cash to drug weight or overestimate the capacity of a drug-
> manufacturing defendant's laboratory.  Alternatively, the court might
> receive bad evidence on the number of drug sales a trafficker typically
> made, or the quantity of drugs sold in each transaction.  In each of
> these cases, a minor mistake would be multiplied into an enormous
> miscalculation – a phenomenon described as the "pyramiding [of]
> unreliable inferences."  Accordingly, even when they satisfy the
> preponderance-of-the-evidence standard of proof, drug quantity
> estimates based on inference and extrapolation will "inherently
> possess a degree of uncertainty." [59]

Such fraught consequences are well-known.  Take this Court's *Stover*

opinion.  The conspiracy prosecution showed the defendants traded in 79% pure

heroin.  The Trial Judge concluded the heroin was diluted fourfold for street sale.

However, the seized street-level heroin was 27-29% pure, meaning that it was only

multiplied by approximately 2.8.  The sentences were remanded for a lower

calculation of the quantity for which each appellant bore responsibility.[60]

---

[58]    *United States v. Moore*, 666 F.3d 313, 322 (4th Cir. 2012).

[59]     Jacob Schuman, *Probability and Punishment: How to Improve Sentencing by Taking Account of Probability*, 18 NEW CRIM. L. REV. 214, 248 (2015) (cleaned up).

[60]    *Stover*, 329 F.3d at 871-873.

*Stover* is no outlier.  The sentence vacated in *United States v. Marquez* reflected a "dramatic leveraging effect" from unreliable factfinding and extrapolating from a garbled coded call.  The First Circuit characterized the resulting Base Offense Level as not "based on a known quantity or readily calculable number of transactions involving clearly established or conservatively estimated quantities." [61] And in *United States v. Shonubi*, the Second Circuit twice reversed heroin trafficking sentences derived from faulty assumptions.[62]

Likewise, the Third and Seventh Circuits require that "a district court cannot simply select a number without at least some description of the reliable evidence used to support the findings and the method used to calculate it."  Each court has vacated infirm quantity calculations.[63]

The Fourth Circuit's opinion in *United States v. Bell*[64] further speaks to the concern here.  In remanding a Oxycodone conspiracy sentence, the court stated:

[61]   699 F.3d 556, 561-562 (1st Cir. 2012). *See also United States v. Sepulveda*. 15 F.3d 1161, 1197 (1st Cir.1993) (rejecting arbitrary midpoint to determine quantity).

[62]   998 F.2d 84, 89-90 (2d Cir. 1993), *appeal after remand*, 103 F.3d 1085, 1092-97 (2d Cir. 1997).

[63]   *United States v. Freeman*, 763 F.3d 322, 339 (3d Cir. 2014) (citing *United States v. Claybrooks*, 729 F.3d 699, 707 (7th Cir. 2013)); *United States v. Garrett*, 757 F.3d 560, 573 (7th Cir. 2014) (same).

[64]   667 F.3d 431 (4th Cir. 2011).

"Notably, however, apart from its Guidelines calculation, in every case, '[r]egardless of whether the district court imposes an above, below, or within-Guidelines sentence, it must place on the record an 'individualized assessment' based on the particular facts of the case before it."[65]  Moreover, "[t]he explanation must be sufficient to allow for 'meaningful appellate review,' such that the appellate court need 'not guess at the district court's rationale.'"[66]  Yet there was "no explanation in the record of any of several underlying factual findings, at least some of which would have been necessary to reach the 700-kilogram number" that mistakenly undergirded the sentence.[67]

The Fifth Circuit addressed this conundrum in *United States v. Lujan*.  The police seized $10,694.  The district court converted that sum into a quantity of methamphetamine, assuming those funds would have been spent buying drugs for resale.  This assumption overlooked the defendant's living expenses.[68]

---

[65]  *Id.*, 667 F.3d at 442 (cleaned up).

[66]  *Id.*, 667 F.3d at 442 (cleaned up).

[67]  *Bell*, 667 F.3d at 445-446.  *See also United States v. Lopez*, 219 F.3d 343, 348-349 (4th Cir. 2000) (quantity calculation rested on conflicting testimony).

[68]  *Lujan*, 22 F.4th at 328-329.

24

In *United States v. Baro*,[69] the Sixth Circuit held that "where, as here, the district court's determination of the quantity of cocaine involved results in a two-level increase in the base offense level, the sentencing judge may not, without further findings, simply sentence a defendant based on conjecture," particularly "before reaching a conclusion which increased the appellants' potential term of incarceration by at least forty-seven months…."[70]  A sentence should be based "'only for that quantity of drugs for which the defendant is more likely than not actually responsible.'"[71]

A recent Eighth Circuit decision, *United States v. Sarchett*,[72] concluded that the district court had endorsed vague (and sometimes) contradictory claims.  The Base Offense Level's resulting over-optimistic doubling proved harmful error.[73]

---

[69]   15 F.3d 563 (6th Cir. 1994).

[70]   *Baro*, 15 F.3d at 569. *See also United States v. Russell*, 156 F.3d 687, 690 (6th Cir. 1998) (remanding); *United States v. Gibbs*, 182 F.3d 408, 441-442 (6th Cir. 1999) (probation officer's quantity calculations were faulty).

[71]   *United States v. Milledge*, 109 F.3d 312, 316, 317 (6th Cir. 1997) (cleaned up) (remanding).  *See also United States v. Woodside*, 642 F. App'x 490, 496 (6th Cir. 2016) ("absence in the record of the numbers the district court used renders its methodology totally opaque").

[72]   3 F.4th 1115 (8th Cir. 2021).

[73]   3 F.4th at 1116-1120.

Ninth Circuit caselaw is equally informative.  In *United States v. Culps*, the sentencing judge estimated 60,250 transactions, based on nine "controlled buys," which was statistically and legally unreliable.[74]  Subsequently, in *United States v. Kilby*,[75] the district court estimated sales of tablets of dissimilar sizes and weights.  That one-size-fits-all approximation was disavowed.[76]  Subsequently, the appellate court found lacking in another prosecution any "reliable evidentiary basis for any of the pivotal assumptions in the drug quantity approximation."[77]

Similar issues invalidated the sentence in *United States v. Forrester*.[78]  Although the lower court's failure to make explicit quantity findings caused a remand, the appellate court added that "when there are two 'equally good measures' for making a calculation under the guidelines, a court must select the one 'bringing the less punishment[.]'"[79]

---

[74]   300 F.3d 1069, 1076 (9th Cir. 2002).

[75]   443 F.3d 1135 (9th Cir. 2006).

[76]   *Kilby*, 443 F.3d at 1141-42.

[77]   *United States v. Chase*, 499 F.3d 1061, 1068-1070 (9th Cir. 2007).

[78]   616 F.3d 929 (9th Cir. 2010).

[79]   *Id.* at 949 (cleaned up).

26

The Tenth Circuit remanded a thirty-year sentence for methamphetamine manufacturing in *United States v. Harrison*.[80]  There "[s]ome of the evidence indicates Defendant's involvement with methamphetamine but is unhelpful with respect to quantities;" "[o]ther trial evidence did speak of quantities but the quantities were not precise and extrapolation would be required to reach the 1.5 kilograms of methamphetamine necessary to support the offense level stated in the PSR."[81]  Reversible error also impacted *United States v. Aragon*,[82] where photographs and estimates failed to account for the packaging.  In remanding, the Tenth Circuit observed that "'the "need to estimate drug quantities at times is not a license to calculate drug quantities by guesswork" but "[g]uesswork seems an apt description of the district court's half-a-gram figure here."'"[83]

---

[80]   743 F.3d 760 (10th Cir. 2014).

[81]   743 F.3d at 764, 765.

[82]   922 F.3d 1102 (10th Cir. 2019).

[83]   922 F.3d at 1112 (cleaned up).

27

Eleventh Circuit precedent is to the same effect.  In *United States v. Butler*,[84] a sentencing decision was overturned for assuming that one day's cocaine transactions sufficed to calculate overall sales during a conspiracy.[85]

G.    Mr. Johnson's Base Offense Level was mistaken.

Applying principles distilled from these decisions confirms that Appellant's sentencing should have "err[ed] on the side of caution, using only reliable or conservative estimates."[86]

Although the Trial Judge was familiar with the PSR,[87] as defense counsel rightly contended, the Probation Office misread the record.[88]  First, it assumed that Mr. Johnson had struck a 32-oz deal with Gage prior to July 26th, although Gage's ambiguous coded calls to Mr. Johnson don't confirm that.  Second, the PSR's assertion that Mr. Johnson had been seeking "gallons" of PCP was unsupported.[89]  Third, the District Judge concluded—with no reference (and none exist)—that Mr.

---

[84]    41 F.3d 1435 (11th Cir. 1995).

[85]    *Id.* at 1446-1447.

[86]    *Cf.*, *United States v. Beltran-Leyva*, 916 F.3d 14, 30 (D.C. Cir. 2016) (cleaned up).

[87]    (App:822).

[88]    (App:851-852).

[89]    *See*, *e.g.*, *Freeman*, 763 F.3d at 337.

Johnson had discussed obtaining "gallons."  That he was distraught all summer over his inability to pay basic bills demonstrates he was no rarified player in the trade.[90]

Also absent was any explanation why Mr. Johnson's urging a Level 30 was off the mark given his few transactions.  What was seized is a matter of record: a *mixture* of 1.4KG, 12% pure—just over 100 grams.  Even if one also assumed that he had made one or even two transactions late in July with Gage—of an unestablished amount of unknown purity—the total still wouldn't meet Level 32's 3 Kilogram threshold.

The Trial Judge's guesswork perhaps was influenced by the presence of callers, whose identity and relationships weren't established, overheard contacting Mr. Johnson and seemingly seeking drugs.  Those inquiries' texts reveal themselves to be chatter; "'[e]xploratory and inconclusive' or 'preliminary' discussions and negotiations are not sufficient to establish an agreement."[91]

Relying on unwarranted speculation was prejudicial.  Before other adjustments and the mandatory add-on for a felon-in-possession conviction, Mr.

---

[90]  *United States v. Carter*, 449 F.3d 1287, 1298-99 (D.C. Cir. 2006) (remanding) (cleaned up).  *See also United States v. Brown*, 892 F.3d 385, 405-406 (D.C. Cir. 2018).

[91]  *United States v. Ienacco*, 893 F.2d 394, 397-398 (D.C. Cir. 1990) (reversing narcotics conspiracy conviction) (cleaned up).

Johnson's Level 32 advisory sentencing range was between 188-235 months for a Criminal History V offender versus the 151-188 months recommended for Level 30 counterparts.[92]  The unreliable quantity finding violates the Constitution and Guidelines and should be rejected.[93]

    H.   <u>Not harmless error</u>

When error appears, "'a remand is appropriate unless the reviewing court concludes, on the record as a whole, … that the error did not affect the district court's selection of the sentence imposed.'"[94]  Should the Government respond that the error in calculating Mr. Johnson's Base Offense Level (and adjustments discussed below) is harmless, it must establish that the District Court would reimpose the sentence on remand.[95]  Nothing in the sentencing colloquy would confirm that claim.

---

[92]  2021 Sentencing Table (available at https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-5) (last accessed August 6, 2022); *See also* (App:909) (PSR calculation of Criminal History)

[93]  *See*, *e.g.*, *Lujan*, 22 F.4th at 328-329; *Aragon*, 922 F.3d at 1112; *Harrison*, 743 F.3d at 764, 765; *Marquez*; 699 F.3d at 561-562; *Bell*, 667 F.3d at 445-446; *Stover*, 329 F.3d at 871-873; *Baro*, 15 F.3d at 569.

[94]  *United States v. Kpodi*, 824 F.3d 122, 129 (D.C. Cir. 2016) (cleaned up).

[95]  *United States v. McIlwain*, 931 F.3d 1176, 1185 (D.C. Cir. 2019); *United States v. Ayers*, 795 F.3d 168, 175-76 (D.C. Cir. 2015).

## II.     The role enhancement also should be remanded.

The District Judge also erroneously credited the Government's claims and ratcheted Mr. Johnson's offense level by 3 points for being a manager-supervisor."[96]  Yet the court never identified the putative organizer-leader whom Mr. Johnson supposedly served.  In truth, he was nobody's "manager" or "supervisor" and held no position of control in any enterprise having at least five "participants."

Comparing reality to the prosecutor's claims proves the point.  If Mr. Johnson could find stock, he'd buy it from whomever offered it and sell what he could to customers.  There is no proof of his controlling a supplier or how goods were transported to him.  And nothing shows him dictating where his customers sold, to whom they sold or the prices they charged.  It takes far more to transform buyer-seller dealings, even for drugs being resold, into a role adjustment.

Because the District Court adopted the prosecutor's claims, we first review the grounds used to justify the adjustment.  Next, we examine the relationships which the prosecutor mentioned and demonstrate that Johnson lacked authority over those people.  To dispel any doubt, an inter-circuit canvass marking factors identified in overturning role adjustments in conspiracy prosecutions confirms our claim.

---

[96]   U.S.S.G. § 3B1.1.

31

A.    <u>Background</u>

The parties disputed any role adjustment.[97]  At sentencing the Trial Judge initially recognized that "in the concept of control or authority is implicit [] the notion of management or supervision, some sort of hierarchical relationship in the sense that an employer is superior to his employees."[98]  In that respect, the District Judge got it right.  He erred by failing to compare the prosecutor's contentions with criteria used by the courts.[99]

---

[97]  *Compare* (App:813-814) (Government recommendation) *with* (App:784-786) (Johnson recommendation).  The PSR's brief justification for the role adjustment lacked clarity.  (App:894).  It described Mr. Johnson as a "direct supplier" to Prailow, Gage and Tabron, although he didn't sell to Tabron and selling drugs alone lacks significance, as discussed below.  Then the PSR lumped in Marshall and three of his cronies, without saying how Mr. Johnson oversaw them—not that it could.  Finally, it cited one Eric Scott as a supplier and manager, but failed to link him to Mr. Johnson—unsurprising since Scott was arrested in May 2017, months before anybody overheard Mr. Johnson.  The PSR, then, is akin to its unilluminating precursor criticized in *United States v. Medina*, 167 F.3d 77, 80 (1st Cir. 1999) (citing *United States v. Graham*, 162 F.3d 1180 (D.C. Cir. 1998)).

[98]  (App:829) (referring to *Graham*).

[99]  (App:846).

At sentencing, the prosecutor dwelled on Mr. Johnson's sometimes-strained relationship with his wife, and focused on his telephone calls to bring his bottles and weapon from their apartment to his car.[100]  Next the prosecutor asserted that Mr. Johnson had "structured" how Gage, Tabron and Prailow would get drugs from him (the example proffered was Mr. Johnson's telling Gage not to bring people with him); then baldly claimed he had "dictated" the prices for his wares and how Prailow would get his share of the West Coast shipmen.[101]  Capping this peroration, the prosecutor described as "dictating" a text message in which Mr. Johnson remonstrated with someone inquiring about "bottles."[102]

Defense counsel responded that Karen Johnson wasn't expressly complicit in her husband's activities, and that Mr. Johnson should get no adjustment (or at most a two-level bump) because, in Guidelines parlance, five or more "participants" weren't involved.  Referring to Section 3B.1.1's alternative qualifying language, counsel emphasized that Mr. Johnson's underlying activities were "not extensive."[103]

---

[100]   (App:835-836).

[101]   (App:837-838).  The prosecutor added that Mr. Johnson had used a firearm to collect his proceeds. *Id.* at 837.  The record doesn't support that.  Moreover, as discussed below, simply carrying a firearm during a drug deal isn't leadership.

[102]   (App:838-839).

[103]   (App:839-841).

The prosecutor responded by insisting that there were more than five participants, and that the activity was extensive.  He referred to "West Coast suppliers" (there's only reference to "Slim"), tossed in "Shorty" (apparently someone owing Mr. Johnson $2800),[104] and invoked the specter of Marshall and his crew.[105]

After adopting the Government's reasons, the Trial Court added that Mr. Johnson "had some effect over the[] control and operation" of "other individuals he talked with, Mr. Tabron, Mr. Gage, Mr. Prailow about the drugs—and Mr. Prailow, he wanted to deliver the gallon as he instructed him."[106]  Also, the Trial Judge referred to "his wife storing the drugs and the gun and getting it from her," the "text message telling people how to use code to describe the drugs," and his "multiple conversations with many of the other individuals who were convicted in the case about supplying the drugs and getting the drugs and when he would get them."[107]

---

[104]   Mr. Johnson received an adjustment for making a credible threat of violence behind "Shorty's" back.  That issue is discussed at Part III, *infra*.  Of relevance here is that Shorty was just a debtor.

[105]   (App:841-842).

[106]   (App:847-848).

[107]   (App:847-848).

B.    <u>What the record showed</u>

Examining Mr. Johnson's actual relationships undercuts this adjustment.

● <u>Supplier</u>.  Mr. Johnson never shared in Slim's (or anyone's) profits or oversaw delivery.

● <u>Co-venturer</u>.  Mr. Johnson didn't share in Prailow's profits, tell him where to sell, whom to sell to, or what price to charge for Prailow's share of Slim's delivery.  Nor did the Government claim that Mr. Johnson recruited Prailow.

● <u>Purchasers</u>.  Mr. Johnson didn't share in anyone's profits, tell anyone where to sell, whom to sell to, or what price to charge for their (few) PCP purchases from him, or recruit anyone.  Tabron was Gage's client and "Shorty" presents as a debtor.[108]

● <u>Retail trade</u>.  Despite a three-year-plus investigation, there's no evidence of Mr. Johnson having a hierarchical position in Marshall's group, much less dictating or overseeing its dealings.

---

[108]   The prosecution portrayed Mr. Johnson as a PCP vendor.  (App:810-812). Whatever contraband—assuming that's what Shorty bought from him—is unknown.

● <u>Prospects</u>.  That Mr. Johnson was overheard telling someone not to broadcast about seeking "bottles" doesn't establish "control" as defined by the law.

● <u>Estranged wife</u>.  It requires more than simply knowing that Mr. Johnson had PCP and packaging in the apartment to make his wife a participant.  Nor is there evidence of control: urging her to place his weapon, cooler and bottles in his car is as consistent with his moving from their apartment as anything.  Although he had influence in their relationship and she may have helped facilitate his committing *some* offense, that wouldn't justify a 3-level role adjustment.

This "bump" was as erroneous as the Base Offense Level.

C.    <u>Discussion</u>

The Guidelines permit an increased offense level: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels...."[109]  Some courts have utilized the Guidelines' Application Notes in considering this adjustment.  These include:

---

[109]    U.S.S.G. § 3B1.1(b).

the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. [110]

No one factor is dispositive.[111]  But "[t]he Guidelines do not define the terms 'manager' or 'supervisor,' so we apply their common meanings."[112]  In undertaking the analysis, caution is in order: "[i]f a judge, a probation officer, a lawyer, even a defendant, doesn't know what a 'manager' or 'supervisor' is, Application Note 4 isn't going to help him-especially since it's about organizers and leaders and *not* middle managers and low-level supervisors[.]  Thus…'a manager or supervisor should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme.'"[113]

Mr. Johnson's adjustment flunks any test.

---

[110]    *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting U.S.S.G. § 3B1.1(b). cmt. n. 4.

[111]    *Graham*, 162 F.3d at 1185 (reversing; factors are relevant to any potential role enhancement). *See also United States v. Cameron*, 573 F.3d 179, 184 n.3 (4th Cir. 2009).

[112]    *United States v. Burnley*, 988 F.3d 184, 188 (4th Cir. 2021) (cleaned up) (remanding).

[113]    *United States v. Weaver*, 716 F.3d 439, 443 (7th Cir 2013) (emphasis original) (cleaned up).

1.    <u>Standard of review.</u>

On review of a leadership enhancement, "'[p]urely legal questions are reviewed *de novo*; factual findings are to be affirmed unless clearly erroneous; and we are to give due deference to the [D]istrict [C]ourt's application of the [sentencing] guidelines to facts. Due deference 'presumably falls somewhere between *de novo* and clearly erroneous.'"[114]

2.    <u>Inter-circuit analysis</u>

The Government's portrait of Mr. Johnson as an influential force within a cohesive group was distorted and out of synch with caselaw.

As this Court has stated, the § 3B1.1 adjustment contemplates "'the concept of "control" or "authority," …to connote some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee.'"[115] The Fourth Circuit concurred with this Circuit's perspective in rejecting as plain error a manager-supervisor increase in *United States v. Slade*, a drug conspiracy case. [116] Slade had sold and/or delivered cocaine to his clientele and co-conspirators, who then sold the drugs to their clientele. Some cohorts sold cocaine "for" him on various occasions, and an unindicted co-conspirator drove him around to deliver

---

[114]   *United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016) (cleaned up).

[115]   *United States v. Quigley*, 373 F.3d 133, 139-140 (D.C. Cir. 2004).

[116]   631 F.3d 185 (4th Cir. 2011).

crack to his clients.  That did not reflect supervisory responsibility; Slade neither controlled anyone's behavior nor directed the terms of their sales.[117]

Here nothing showed Mr. Johnson controlling Prailow and Gage—or Tabron (whom Mr. Johnson didn't deal with), or Shorty.

Further confirmation of the faulty role adjustment comes from three Seventh Circuit decisions.  Reversing a role adjustment, *United States v. Mustread*[118] held that "by itself, being a distributor, even a large distributor [], is not enough to support a § 3B1.1 offense level increase *** [and] that Mustread 'exercised total decision-making authority over his marijuana purchases' cannot, by itself, support the conclusion that Mustread played an aggravated role."[119]

Subsequently, in *United States v. Weaver*, the defendant "fronted" methamphetamine, urging buyers to sell it quickly to pay him.  Essentially rejecting precursors of themes regurgitated here, the Seventh Circuit deemed it of no moment that defendant had been cautious and budged little on price, delivery location, and quantity, sometimes keeping his customers waiting and not honoring

---

[117]    *Slade*, 631 F.3d at 189-192.  *See also United States v. Sayles*, 296 F.3d 219, 224-25 (4th Cir.2002) (reversing; "being a buyer and seller of illegal drugs, even in league with more than five or more other persons, does not establish that a defendant has functioned as an 'organizer, leader, manager or supervisor'").

[118]    42 F.3d 1097 (7th Cir. 1994).

[119]    *Id.* at 1194 (cleaned up).

their requests for specific delivery times.  He, like Mr. Johnson, did not tell them what price to charge, impose territorial limits on sales, or set distribution quotas.[120]

The third Seventh Circuit holding also disposes of the prosecutor's unsworn (and unsupported) statement that Mr. Johnson's using a firearm to collect drug debts could support a role enhancement.  However, there was no evidence that he'd done that.  In recognizing that § 3B1.1 demands evidence of such factors as recruitment, a larger share of an organization's profits and dictating venues and resale pricing, *United States v. Bell* explained that "[t]he mere possession of a firearm during the course of criminal activity, however, does not evidence a leadership or organizational role." [121]

The First Circuit's views in *United States v. Castellone*[122] also bear reference.  There the Government argued the appellant had determined who purchased his marijuana, when and where sales occurred, and the prices and his profit—as it theorized here.  Rejecting that analogy, the court of appeals emphasized that those are characteristic of any independent street-level dealer, who requires a customer, a time and location for the sale, and a price.  The profit

---

[120]    *Weaver*, 716 F.3d at 443-445 (citing cases). *See also United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994) ("Supplying drugs and negotiating the terms of their sale do not by themselves justify a § 3B1.1 increase ….").

[121]    28 F.3d 615, 618 (7th Cir. 1994).

[122]    985 F.2d 21 (1st Cir 1993).

defendant made was his alone.  And nothing suggested that Castellone controlled his supplier (or anyone else).[123]

Another relevant multi-seller conspiracy prosecution is the Third Circuit opinion in *United States v. Belletiere*.[124]  The defendant sold cocaine to Craig, who used some and sold some to others, including Mishinski, without direction from Belletiere.  Mishinski also received packages from Belletiere at Craig's request.  Craig also sold cocaine to Yurkovic, who sometimes purchased directly from Belletiere.  And Forte purchased drugs from Belletiere with the DeAngelo brothers.[125]  None were led, organized by, or answerable to Belletiere.  And nothing showed any links beyond his individual sales to these dealers.[126]

Two Sixth Circuit decisions also presage the prosecutor's exaggerated claims below.  Recall that Gage called Mr. Johnson several times seeking to buy

---

[123]    985 F.2d at 26.  *See also United States v. Al-Rikabi*, 606 F.3d 11 (1st Cir 2010) (remanding 3B.1.1 adjustment; government offered no proof that appellant's customer was subservient to him or subject to his authority.  If anything, she acted as a free agent, dealing with defendant as any street-level seller would deal with a source of supply.).

[124]    971 F.2d 961 (3d Cir. 1992).

[125]    *Belletiere*, 971 F.2d at 971-972.

[126]    *Id* .at 972.

PCP.  In *United States v. Gibson*,[127] one defendant had provided cocaine in two of the transactions listed in the indictment, but these sales were solicited by a co-conspirator, suggesting that the *co-conspirator* exercised control over their dealings.  The evidence with respect to the second defendant was similarly deficient: he neither initiated any transactions nor exercised control over anyone. That the appellants were paid for their drugs didn't distinguish them from most buyers and sellers.[128]

The Tenth Circuit rebuffed a role adjustment where the defendant supplied drugs but no sellers worked for him, he paid nobody for their efforts on behalf of the conspiracy, didn't restrict those to whom other conspirators could sell their drugs, and didn't control the manner of sales, or set prices.  Although he (unlike Mr. Johnson) possessed large sums of money, the government did not show how the conspiracy's profits were divided, or that defendant received a larger share of the profits.[129]

The foregoing decisions' reasoning proves that basing Mr. Johnson's organizational adjustment on Gage, Prailow, and Tabron plainly was mistaken.

---

[127]  985 F.2d 860 (6th Cir. 1993).

[128]  *Id.*, 985 F.2d at 866-867.

[129]  *United States v. Anderson*, 189 F.3d at 1201 (10th Cir. 1999).

42

Nor could the Marshall crew's presence justify a role adjustment, even if the Government had linked Mr. Johnson to it—which it didn't.  The Sixth Circuit addressed a representative cocaine conspiracy prosecution.  One conspirator received cocaine from the appellant, which then was distributed to others for further distribution.  However, the appellant's lack of connection with the third tier of sellers required remanding his leadership bump.[130]

Similar circumstances sundered a role adjustment in *United States v. Rodriguez-Lopez*.[131]  The Fifth Circuit found "no evidence that Barron recruited others to join the Cavazos organization conspiracy, and there is no evidence that Barron exercised control over others involved with the conspiracy *** and no evidence that Barron was involved in planning the operations of the Cavazos organization conspiracy." [132]

No difference exists here: Mr. Johnson didn't oversee the Marshall crew, recruit for it, tell its members what to sell, where to sell, or share in its profits.

Looking up the line, the Trial Judge should have rejected as a back-up justification Mr. Prailow's co-investing in the ill-fated October purchase.  That decision conflated control over property, not of another participant.  In *United*

---

[130]    *United States v. Garcia*, 19 F.3d 1123, 1125 (6th Cir. 1994).

[131]    756 F.3d 422 (5th Cir. 2014).

[132]    *Id.*, 756 F.3d at 435.

*States v. Holden*,[133] the appellant and another organized a fraud scheme employing a joint venture agreement. Reversing an "organizer" adjustment, the Ninth Circuit recognized that each had contributed to the fraud and agreed to share in its profits. Appellant had "facilitated" the offense but did not exercise "organizational control" over his coconspirator.[134]

Slim's presence is meaningless. Nothing indicates that Mr. Johnson oversaw delivery[135] or controlled him.[136]

The prosecutor's remaining rationalizations, beginning with Mr. Johnson's urging an unknown prospect not to mention "bottles" when texting for PCP, add

---

[133]  908 F.3d 395 (9th Cir 2018).

[134]  908 F.3d at 401-403. *See also United States v. Logan*, 121 F.3d 1172, 1179 (8th Cir. 1997) (remanding; no agreement to share profits); *United States v. Ronning*, 47 F.3d 710, 712 (5th Cir. 1995) (remanding; "Applying a plain-meaning approach to 'leader' and 'organizer,' we note that their definitions relate to supervision of people only.").

[135]  *Vargas*, 16 F.3d at 160; *United States v. Thompson*, 944 F.2d 1331 (7th Cir. 1991) (reversing; no evidence defendant had controlled couriers from Los Angeles to Milwaukee).

[136]  *Castellone*, 985 F.2d at 26. *Cf.*, *United States v. Colon*, 919 F.3d 510, 518-519 (7th Cir. 2019) ("role adjustment is appropriate for a middleman only when coupled with other facts indicating the defendant exercised some control over others involved in the crime or was responsible for organizing others in carrying out the operation"; finding harmless error).

nothing.  This standalone call was never connected to any hierarchical venture which Mr. Johnson supposedly managed or supervised.[137]

Then there is Karen Johnson.  Although it would blink reality to dispute that the marital relationship was marred by discord, the prosecutor's references to that at sentencing to justify a three-level role adjustment[138] were gratuitous.  Once more, proof of Mr. Johnson's involvement in any hierarchical enterprise with at least five participants is lacking.

Having influence in his wife's life doesn't validate this role increase.[139]  Nor could it be justified by their sharing an apartment while he stored PCP and paraphernalia, before he moved in with another woman—a role adjustment demands more than a wife's knowing what was going on.[140]

Lastly, urging Ms. Johnson on October 11, 2017, right after the West Coast shipment had arrived, to take his weapon, cooler and bottles from the apartment down to his car wouldn't justify this bump.  Their conversations that evening,

---

[137]   *Graham*, 162 F.3d 1183-84 ("directing buyers to sellers does not constitute management or supervision....").

[138]   (App:835-836).

[139]   *United States v. Jordan*, 291 F.3d 1091, 1098 (9th Cir. 2002) (reversing adjustment).

[140]   *United States v. Maloof*, 205 F.3d 819, 830 (5th Cir. 2000) ("A finding that other persons knew what was going on is not a finding that these persons were criminally responsible for commission of an offense").

although painful reading from a domestic perspective, fully confirm that a manager-supervisor adjustment was unjustified.  He was moving to live with someone who had borne his child.  Ms. Johnson understandably was upset.  Her desire that he get his effects out is unmistakable.[141]

Her taking a weapon and paraphernalia downstairs to the car perhaps facilitated Mr. Johnson's ability to do business—but more is needed to justify this adjustment, as *United States v. Mankiewicz* exemplifies.[142]  There, the defendant recruited his father to help him, but his "directions" merely showed his father where marijuana bales should be stacked, with a request to accompany an informant to a motel where an informant would deal with the operation's leader.  The Seventh Circuit found this was not the sort of "real and direct influence, aimed at furthering the criminal activity" for which the enhancement was intended. [143]

Similarly, the Fourth Circuit rejected a leadership enhancement based on a narcotics dealer's having a chauffeur driving him to his buyers.[144]  That the dealer presumably routinely told his driver where to take him was deemed insufficient,

---

[141]    (App:453-461 & 733-734, 739-740, 745-748, 751-754, 755-757).

[142]    122 F.3d 399 (7th Cir. 1997).  *See also Holden*, 908 F.3d at 403 (defendant's giving third party instructions for sending investors' funds to scam was "best characterized as 'facilitation' rather than 'organization'") (cleaned up).

[143]    122 F.3d at 405-406 (citation omitted).

[144]    *Burnley*, 988 F.3d at 188 (citing *Slade*, 631 F.3d at 190-191).

just as Mr. Johnson's statement to his wife amidst the deterioration of their relationship should be construed.

These decisions further confirm that the manager-supervisor adjustment should be vacated.

### III. Imposing an enhancement for making a credible threat of violence was error. The context of Mr. Johnson's statements shows they were borne of frustration, not intimidation.

Mr. Johnson opposed the Government and the Probation Office's recommending a two-point offense level adjustment under U.S.S.G. § 2D1.1(b)(2) for making credible threats to use violence incident to the underlying narcotics offense.[145] When imposing the enhancement, the Trial Judge paraphrased three of Mr. Johnson's remarks captured on wiretaps and pronounced them credible threats.[146] This decision was erroneous.

*First*, Mr. Johnson never directly threatened anyone or asked anybody to do that. The prosecutor, Probation Officer and Trial Judge never appreciated that his remarks were an uneducated laborer's expressions of frustration.

*Second*, no contemporaneous evidence suggested Mr. Johnson intended harm. Those to whom he spoke never deemed his statements as meaningful threats. The agents recognized that after making the first statement he never varied

---

[145]   *Compare* (App:890-891, 897; 814-815) *with* (App:790-791).

[146]   (App:832-834).

his normal routine.  And his wife's reaction to the last voluble comment was to laugh about it.

*Third*, the District Court used Mr. Johnson's 2003 ADW conviction to infer that he possessed the intent to harm in 2017.  The prior offense's circumstances are a world apart.  He and another man had squabbled over a woman's affections. However, the judge took the unreliable step of employing a long-ago unrelated bad act to infer bad character.

A.    Standard of review

Legal questions presented in § 2D1.1(b)(2) appeals are reviewed *de novo*, factual findings are examined for clear error, and deference is given to district courts' application of the guidelines to the facts.[147]

B.    Mr. Johnson never threatened to harm anyone.

Because the District Judge never considered the challenged statements' contexts and then factored in inapposite propensity evidence, the Court should review this claim *de novo* and vacate the adjustment.

---

[147] *United States v. Pineda-Duarte*, 933 F.3d 519, 522 (6th Cir. 2019); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 82 (2d Cir. 2019); *United States v. Sykes*, 854 F.3d 457 459, 461 (8th Cir. 2017).

48

1.    <u>The sentencing proceedings</u>

On August 27, 2017—when Mr. Johnson's business was "'hurting like shit'"[148]—he told Prailow about being "fucked up" "waiting" on the West Coast shipment.  Mr. Johnson said that he had "no money" and "might gotta slide up on this lil nigga [who] owe 2800."  If the man did not honor a promise to pay "in a couple of days," then "by Monday, man, Imma lay it up on this little dude. Imma strap up, and slide up on [S]horty man. Be like [S]horty come on in man."[149] Defense counsel argued that given the conversation's tenor this statement wasn't a credible threat.[150]

On September 8, 2017, Mr. Johnson and Jamar Gage's brother, Makel Gage, were reviewing the dearth of supply.  Mr. Johnson was upset with a 30-day eviction notice. Pointing out that he had "like four, five thousand in the streets," he mentioned "a nigga up Clay Terrace, shawty [*sic*], owe 3000 man.  I'm on his ass bruh. You feel me?  I ain't pay my car notes or nothing.  I just seen him, he talking about he (U/I).… Shawty gonna make me punch him in the mouth with that gun. Imma go to his mother first because his mother live up there.  And say tell your

---

[148]    (App:809).

[149]    (App:687-689).  *See also* (App:809-810, 890-897).

[150]    (App:791).

49

son give my money man."[151]  At sentencing, Mr. Johnson contended that this

comment could be inferred as meaning that he would go by Shorty's mother's

house to find him and that the aside about punching him was equivocal.[152]

    c.  On October 11, 2017, amidst a flurry of late-night telephone calls and

texts, Mr. Johnson called his wife and entreated her to allow him to return to their

apartment.  After she hung up, he called back.  After she picked up the receiver, he

said "Yeah yeah yeah yeah yeah yeah yeah yeah. You better not have no nigga in

there around my shit! I'm a kill his ass!  On my life! Kill his ass!"[153]  Mr. Johnson

submitted that he was upset about another man possibly having sexual relations

with his wife at their former marital abode and that these words were hyperbole.[154]

    In summarizing, defense counsel stated that Mr. Johnson had "made some

statements in the heat of the moment, in the context of what was going on in his

life in those days, but there's no evidence that those threats were actually genuine

or that they were carried out in some force or manner."[155]  However, the District

Court found each statement a credible threat, and that Appellant's "history and

---

[151]    (App:727-728).  *See also* (App:810; 890, 897).

[152]    (App:790).

[153]    (App:741-742).  *See also* (App:810; 891, 897).

[154]    (App:791).

[155]    (App:832).

convictions for assault, including shooting an individual earlier on in his life, as well as assaults on other individuals and showing a history of violence, lend credibility to those statements that he gave at the that time that he would use violence to effect his drug practices and drug trafficking that he was doing."[156]

This decision never addressed these communications' context and depended on an unreliable inference from an ancient unrelated other bad act.

      2.    <u>Mr. Johnson's speech and the contemporaneous evidence undermines any threat theory</u>.

The District Judge never recognized that Mr. Johnson is the product of a broken, drug-infested home, withdrew from the eleventh grade while failing school and never attained a GED.[157]  His texts and wiretaps—attached within the Appendix—confirm that his lingo mirrors his background.[158]  He never confronted anyone nor asked anyone else to do so and nobody who heard his statements indicated that he'd made a credible threat.

    a.  Mr. Johnson's two calls during which he mentioned Shorty centered on Mr. Johnson's inability to meet living expenses.  The discussions never fleshed out a plan to intimidate Shorty.  Tellingly, when seeking to extend the wiretap on Mr.

---

[156]  (App:832-833).

[157]  (App:918-919, 924).

[158]  *See generally* (App:660-772).

Johnson, the FBI informed Judge Contreras of Mr. Johnson's aside to Prailow and conceded that "[a]lthough JOHNSON stated he would 'strap up' and approach the individual on Monday (August 28th), law enforcement investigation confirmed that JOHNSON kept his usual routine that day. The agents are not aware of any attempt by JOHNSON to carry out any act of violence."[159]

b. The September 8th telephone call with Makel Gage (App:727-728) reveals Mr. Johnson as being of two minds about Shorty. On one hand, he pondered over what he could do if Shorty continued being evasive; on the other hand, he mused over approaching Shorty's mother as a conduit to collect on a debt. Nowhere did Mr. Johnson commit himself to any course or ask Gage to do it, however. Indeed, the notion that Mr. Johnson intended to involve Shorty's mother is implausible. That would have brought a needless third-party into his affairs— which the agents recognized as secretive.[160]

In seeking to extend the wiretapping, the officers never asserted that Mr. Johnson's discussion with Gage included a tangible threat.[161] Nor did they present

---

[159]    (App:171) (referring to App:687-689).

[160]    Mr. Johnson had remonstrated with Gage for trying to bring along Tabron to a meeting. (App:183).

[161]    (App:177-178).

surveillance evidence suggesting that Mr. Johnson had approached Shorty or his mother.

c.  The October 11th communications between Mr. and Ms. Johnson also betrays any later-coined conception that he'd genuinely intended to harm anybody. Never did she express the outrage to be expected had he threatened anyone. Indeed, their penultimate call was marked by her laughing while they reprised his earlier salty remarks; their last call ended with her telling him "Love you."[162]  And later she wrote a letter of support at sentencing,[163] which also is at odds with the idea that she considered him to have threatened her or any guest.

C.    Discussion

Coupling the § 2D1.1(b)(2) caselaw with these conversations' contexts demonstrates this adjustment's error.

A defendant's offense level may be increased by two levels for making "a credible threat to use violence . . . during a drug trafficking offense."[164]  Because

---

[162]  (App:745-748, 749-750, 751-754, 755-757 (reporting laughter at page 1), 762-763).

[163]  (App:817).

[164]  U.S.S.G. § 2D1.1(b)(2).

the Guidelines and comments do not define a "credible threat," "dictionaries can fill the interpretative gap."[165]

A "threat" means "a declaration of one's purpose or intention to work injury to the person, property, or rights of another. A threat has been defined to be any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free, voluntary action which alone constitutes consent."[166] Section 2D1.1(b)(2) demand that a threat be "credible" also is consistent with the law: a true threat requires proof of the speaker's subjective intent to harm a victim.[167]

Mr. Johnson's patois contained no credible threats.

      1.    <u>The credible threat adjustment typically requires corroboration</u>.

The common thread of appellate decisions construing § 2D1.1(b)(2) adjustments is *contextual evidence* that a drug trafficker genuinely threatened

---

[165]    *United States v. Jaimes-Molina*, 2015 WL 4254459, *4 (N.D. Ind., Sept. 9, 2019) (citing *United States v. Pineda-Duarte*, 933 F.3d 519, 523 (6th Cir. 2019) (quoting from WEBSTER'S NEW INTERNATIONAL DICTIONARY and BLACK'S LAW DICTIONARY)).

[166]    BLACK'S LAW DICTIONARY ONLINE (2d ed.) (available at file:///C:/Users/sleckar/AppData/Local/Microsoft/Windows/INetCache/Content.Ou tlook/1K4HRKGJ/What%20is%20THREAT_%20definition%20of%20THREAT %20(Black's%20Law%20Dictionary).pdf) (last accessed May 24, 2022).

[167]    *Elonis v. United States*, 135 S. Ct. 2001, 575 U.S. 723 (2015).

somebody and/or sought to use another to convey that message <u>and</u> personally or through a proxy intended to use violence.[168]

One representative case is *United States v. Kirk Tang Yuk*, where the appellant spoke about killing witnesses and then procured others to approach them and to relay messages from him, hardly "'mere puffery.'"[169] *United States v. Lewis-Zubkin* upheld an adjustment where the appellant followed up threats by paying a co-conspirator to beat up perceived cooperators.[170] In *United States v. Sykes*, the defendant said he intended to shoot a perceived thief and then confronted that individual with a firearm.[171] Similarly, in *United States v. Perez* the appellants brazenly threatened people to their face.[172] That's missing here.

The unreported opinions have also scrutinized the contemporaneous circumstances to confirm that a later-questioned statement wasn't hyperbole. For instance, in *United States v. Seagers*, witnesses testified that the appellant had threatened potential witnesses, tried to bribe one to disappear, and sought to hire

---

[168]   *United States v. Price*, 409 F.3d 436, 444 (D.C. Cir. 2005) (prosecution's burden "is triggered whenever a defendant disputes the factual assertions in the [Presentence] report.").

[169]   *Kirk Tang Yuk*, 885 F.3d at 82-83 (cleaned up).

[170]   907 F.3d 1103, 1104 (8th Cir. 2018).

[171]   854 F.3d 457, 460-461 (8th Cir. 2017).

[172]   962 F.3d 420, 451 (9th Cir. 2020).

someone to kill witnesses.[173]  The defendant in *United States v. Cantu* confronted the arresting officer with statements that the "Texas Mexihan Mafia" possessed personal information about him and recommended he cover his face when making arrests.[174]  In *United States v. Barrera*, the defendant directly threatened to kill an informant.[175]  And *United States v. Fernandez* upheld an enhancement where the appellant shot a victim who resisted using their apartment for drug operations, and then warned a building superintendent who'd notified police of the drug activity that he would "go up in there and would stab everybody up."[176]

Other unreported cases presented ample corroboration of intent.  In *United States v. White*, the defendant urged fellow gang members to commit violence.[177] In *United States v. Redifer*, the appellant brandished a weapon when collecting drug debts.[178]  And in *United States v. Walker*, the appellant threatened to kill a co-

---

[173]  2021 WL 4306117, \*2 (4th Cir. Sept. 22, 2021).  *See also United States v. Thomas*, 33 Fed. App'x. 782, 787-788 (11th Cir. 2020) (armed defendant confronted rival dealer).

[174]  765 Fed. App'x 111, 111 (5th Cir. 2019).

[175]  697 Fed. App'x 373, 374 (5th Cir. 2017).

[176]  636 Fed. App'x 71, 74 (2d Cir. 2016).

[177]  621 Fed. App'x 889, 893 (9th Cir. 2015).

[178]  631 Fed. Appx. 548, 563-564 (10th Cir. 2015).

conspirator and her daughter, punched her in the neck, and said he'd hurt another coconspirator if she wouldn't destroy evidence.[179]

No similar corroboration appears here.

> 2. The circumstances surrounding Mr. Johnson's remarks were equivocal and the evidence which the Trial Judge invoked was an unreliable marker of intent.

As we have seen, Mr. Johnson's offhanded statements to Prailow and Makel Gage about hitting Shorty or visiting Shorty's mother were made amidst bellyaching over finances and empty stock. They reflect his penchant for using the vernacular in speaking. His correspondents didn't intimate that they'd heard a true threat. And the prosecution never asserted that he had deviated from his normal routine after mentioning his frustration with Shorty. Nor did Karen Johnson's behavior on October 11th bespeak fear—later that evening she laughed while reprising his earlier statements. She would know him better than anyone; if *she* hadn't perceived his excited remark as a threat, then it is quite the stretch for others to have done so.

The adjustment cannot be saved by looking to Mr. Johnson's "history of violence" and "convictions for assault, including shooting an individual earlier on

---

[179]   578 Fed. App'x 812, 820 (11th Cir. 2014). *See also United States v. Resterhouse*, 685 Fed. App'x. 436, 439-440 (6th Cir. 2017) (appellant solicited informant to kill co-conspirator).

in his life…."[180]   Because the District Court focused on Mr. Johnson's long-ago
ADW conviction, we will follow suit.

That case arose from a 2001 confrontation over a woman's affections.[181]   Its
usefulness to gauge intent animating statements made sixteen years later under
greatly differing circumstances is vanishingly slim, for typically "the doing of
similar acts" (or here, one act) is not relevant to the doing of a particular act.[182]

Relying on an ADW conviction arising from a failed romance elides the
principle that prior offenses shouldn't be used to infer a predisposition to commit
the crime charged.[183]   If anything, "prior crimes involving deliberate and carefully
premeditated intent—such as fraud and forgery—are far more likely to have
probative value with respect to later acts than prior crimes involving a quickly and
spontaneously formed intent—such as assault in the case before us."[184]

---

[180]   (App:833).

[181]   (App:903-904).

[182]   2 J. WIGMORE, EVIDENCE § 304 at 249-251 (Chadbourn rev. 1979).

[183]   *Martin v. United States*, 127 F.2d 865, 866 (D.C. Cir. 1942).  *Martin* is a
"leading authority in this jurisdiction" on excluding other crimes evidence.  *Drew
v. United States*, 331 F.2d 85, 94 n. 7 (D.C. Cir. 1964).

[184]   *United States v. San Martin*, 505 F.2d 918, 922-923 (5th Cir. 1974) (Tuttle, J).
*Cf.*, *United States v. Bettencourt*, 614 F.2d 214, 217 (9th Cir.1980) ("showing of
intent to assault on an earlier occasion proves little, if anything, about an intent to
assault at some later time.").

Nor is it sound to rely on dissimilar events that occurred years before. [185] As this court has observed, a decade-old conviction's "staleness … reduces its probative value such that it is 'substantially outweighed' by the danger of unfair prejudice already inherent in the admission of prior-bad-act evidence."[186]

These precepts coalesce here. Although the Federal Rules of Evidence don't apply to sentencing,[187] a sentence demands reliable supporting information.[188] The Trial Judge tacked propensity character evidence onto facially equivocal surrounding circumstances. But propensity evidence is a form of character evidence and the "[r]ampant use of character constructs—[in] sentencing, and parole—is especially troubling in relation to accuracy and justice, inasmuch as people ordinarily perform poorly at empirically judging the character of strangers.

---

[185]  *San Martin*, 505 F.2d at 922-923 (reversible error to admit decade-old assault convictions).

[186]  *United States v. Sheffield*, 832 F.3d 296, 307-309 (D.C. Cir. 2016) (stale PCP distribution conviction inadmissible to show knowledge and intent at trial for similar crime; but harmless error).

[187]  Rule 1101(d)(3), F. R. Evid.

[188]  *United States v. Miele*, 989 F.2d 659, 663-664 (3d Cir. 1993) (remanding; faulty drug quantity finding).

Evaluations tend to be misguided and often incorrect. Character constructs themselves may be unstable over time and over different situations."[189]

"A sentencing court acts unreasonably if it commits legal error in the process of taking the Guidelines or other factors into account" [190] and "regardless of length, a sentence based on an error of law is *per se* unreasonable."[191] The District Court's failure to analyze the contested statement's contemporaneous contexts and reliance on legally unsound and combustible character evidence was reversible error.

---

[189] Robert J. Sampson & L. Ash Smith, *Rethinking Criminal Propensity and Character: Cohort Inequalities and the Power of Social Change*, 50 CRIME AND JUSTICE: A REVIEW OF RESEARCH 13, 40 (2021).

[190] *United States v. Bras*, 483 F.3d 103, 106 (D.C.Cir.2007) (cleaned up).

[191] *United States v. Price*, 409 F.3d 436, 442 (D.C. Cir. 2005).

**Conclusion**

The cause should be remanded for resentencing.

Respectfully submitted,

/s/ Stephen C. Leckar
Stephen C. Leckar, No. 281691
Kalbian Hagerty LLP
888-17th St., NW, 10th Floor
Washington, D.C. 20006
Office: (202) 419.3286/742-4242
Fax: (202) 223-6625
sleckar@kalbianhagerty.com
Counsel for Appellant Lamont Johnson

(*Appointed under the Criminal Justice Act*)

## Certificate of Compliance

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [12,280] words.

    [    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.  This brief document complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: September 6, 2022                    /s/ Stephen C. Leckar
                                            *Counsel for Appellant*

## Certificate of Filing and Service

I hereby certify that on this 6th day of September, 2022, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Chrisellen R. Kolb
> Suzannne Greely Curt, Esq.
> OFFICE OF THE U.S. ATTORNEY
> 601 D Street, NW, Room 8104
> Washington, DC  20530
> (202) 252-6829

> *Counsel for Appellee*

I further certify that on this 6th day of September, 2022, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ Stephen C. Leckar
*Counsel for Appellant*

# Addendum

## <u>TABLE OF CONTENTS</u>

<u>**Addendum Page**</u>

U.S. CONST. amend. V ........................................................................Add. 1

Sentencing Guidelines........................................................................Add. 1

U.S.S.G. § 2D1.1................................................................................Add. 1

U.S.S.G. § 3B1.1................................................................................Add. 3

U.S.S.G. § 2D1.1(b)(2) ......................................................................Add. 3

## Appendix

### I.      **U.S. Constitution, Amdt. 5**

No person shall ... be deprived of life, liberty, or property, without due process of law

### II.     **Sentencing Guidelines**

§ 2D1.1.    Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy.

(a)      Base Offense Level (Apply the greatest):

\*\*\*

(5)      the offense level specified in the Drug Quantity Table set forth in subsection (c), except that if (A) the defendant receives an adjustment under §3B1.2 (Mitigating Role); and (B) the base offense level under subsection (c) is (i) level **32**, decrease by **2** levels; (ii) level **34** or level **36**, decrease by **3** levels; or (iii) level **38**, decrease by **4** levels. If the resulting offense level is greater than level **32** and the defendant receives the **4**-level ("minimal participant") reduction in §3B1.2(a), decrease to level **32**.

**(c) DRUG QUANTITY TABLE**

| **Controlled Substances and Quantity\*** | **Base Offense Level** |
|---|---|
| (4) • At least 3 KG but less than 10 KG of Heroin;<br>    • At least 15 KG but less than 50 KG of Cocaine;<br>    • At least 840 G but less than 2.8 KG of Cocaine Base; | **Level 32** |

**Add. 1**

- At least 3 KG but less than 10 KG of PCP, or
    at least 300 G but less than 1 KG of PCP (actual);
- At least 1.5 KG but less than 5 KG of Methamphetamine, or
    at least 150 G but less than 500 G of Methamphetamine (actual), or
    at least 150 G but less than 500 G of "Ice";
- At least 1.5 KG but less than 5 KG of Amphetamine, or
    at least 150 G but less than 500 G of Amphetamine (actual);
- At least 30 G but less than 100 G of LSD;
- At least 1.2 KG but less than 4 KG of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] Propanamide);
- At least 300 G but less than 1 KG of a Fentanyl Analogue;
- At least 3,000 KG but less than 10,000 KG of Marihuana;
- At least 600 KG but less than 2,000 KG of Hashish;
- At least 60 KG but less than 200 KG of Hashish Oil;
- At least 3,000,000 but less than 10,000,000 units of Ketamine;
- At least 3,000,000 but less than 10,000,000 units of Schedule I or II Depressants;
- At least 187,500 but less than 625,000 units of Flunitrazepam;
- At least 3,000 KG but less than 10,000 KG of Converted Drug Weight.

(5) • At least 1 KG but less than 3 KG of Heroin;                    **Level 30**
- At least 5 KG but less than 15 KG of Cocaine;
- At least 280 G but less than 840 G of Cocaine Base;
- At least 1 KG but less than 3 KG of PCP, or
    at least 100 G but less than 300 G of PCP (actual);
- At least 500 G but less than 1.5 KG of Methamphetamine, or
    at least 50 G but less than 150 G of Methamphetamine (actual), or
    at least 50 G but less than 150 G of "Ice";
- At least 500 G but less than 1.5 KG of Amphetamine, or
    at least 50 G but less than 150 G of Amphetamine (actual);
- At least 10 G but less than 30 G of LSD;
- At least 400 G but less than 1.2 KG of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] Propanamide);
- At least 100 G but less than 300 G of a Fentanyl Analogue;
- At least 1,000 KG but less than 3,000 KG of Marihuana;
- At least 200 KG but less than 600 KG of Hashish;

**Add. 2**

• At least 20 KG but less than 60 KG of Hashish Oil;
• At least 1,000,000 but less than 3,000,000 units of Ketamine;
• At least 1,000,000 but less than 3,000,000 units of Schedule I or II Depressants;
• At least 62,500 but less than 187,500 units of Flunitrazepam;
• At least 1,000 KG but less than 3,000 KG of <u>Converted Drug Weight</u>.

### § 3B1.1.    Aggravating Role

Based on the defendant's role in the offense, increase the offense level as follows:
(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels

### § 2D1.1(b)(2).    Threat

(b) Specific Offense Characteristics

***

(2) If the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by 2 levels.

**Add. 3**